# EXHIBIT 1
# VERIFIED COMPLAINT

## STATE OF MICHIGAN
## MACOMB COUNTY CIRCUIT COURT

AQUENT, LLC, a Delaware limited liability
company,

        Plaintiff,

v.

MICHIGAN GAGE AND MANUFACTURING,
LLC, a Michigan limited liability company; THE
SINACOLA GROUP, LTD., a Nevada corporation;
MICHIGAN GAGE TECHNOLOGIES, LLC, a
Michigan limited liability company; MICHAEL
PORATH, an individual; RICHARD MAST, an
individual; PRESTIGE CAPITAL CORPORATION,
a New Jersey corporation; JPMORGAN CHASE
BANK, N.A., a national banking association; HARTSKO
FINANCIAL SERVICES, LLC, a Delaware limited
liability company; INTERNAL REVENUE SERVICE;
MICHIGAN DEPARTMENT OF TREASURY;
UTICA LEASCO, LLC; a Michigan limited liability
company; BELL FORK LIFT, INC., a Michigan
corporation; and MARY DOBDAY, an individual,

        Defendants.

CASE NO. 0 8 - 5 1 6 7 - C K -CK

MATTHEW SWITALSKI
P51433

RECEIVED

NOV 1 9 2008

CARMELLA SABAUGH
MACOMB COUNTY CLERK

---

ERMAN, TEICHER, MILLER,
ZUCKER & FREEDMAN, P.C.
By: Dianne S. Ruhlandt (P60483)
Attorneys for Plaintiff
400 Galleria Officentre, Suite 444
Southfield, MI 48034
(248) 827-4100
druhlandt@ermanteicher.com

---

There is no other pending or resolved civil action arising out
of the transactions or occurrences alleged in this Complaint.

## VERIFIED COMPLAINT

Aquent, LLC ("Aquent" or "Plaintiff"), by and through its undersigned counsel, Erman,

Teicher, Miller, Zucker & Freedman, P.C., states for its Complaint against the above-named

Defendants as follows:

### Jurisdiction and Venue

1.      Jurisdiction is proper in the Circuit Court as the amount in controversy exceeds $25,000.00, exclusive of interest, costs and attorney's fees.

2.      Venue is proper in the Circuit Court, pursuant to MCL 600.1605, as the subject personal property is located in Macomb County, Michigan.

### Parties

3.      Plaintiff Aquent is a limited liability company organized under the laws of the State of Delaware.   It maintains an office at 1747 Veterans Memorial Highway, Suite 6, Islandia, New York 11749.

4.      Michigan Gage and Manufacturing, LLC ("MGM") is a limited liability company organized under the laws of the State of Michigan.   Its principal office is located at 44404 Phoenix Drive, Sterling Heights, Michigan 48314.

5.      The Sinacola Group, Ltd. ("Sinacola") is incorporated under the laws of the State of Nevada.   Upon information and belief, its principal office in the State of Michigan is located at 26677 W. Twelve Mile Road, Southfield, Michigan 48034.

6.      Michigan Gage Technologies, LLC ("MGT") is a limited liability company organized under the laws of the State of Michigan.   Upon information and belief, its principal office is located at 3275 Lapeer West Road, Auburn Hills, Michigan 48326.

7.      Michael Porath ("Porath") is an individual who resides in the State of Michigan.

8.      Richard Mast ("Mast") is an individual who resides in the State of Michigan.

9.      Prestige Capital Corporation ("Prestige") is incorporated under the laws of the State of New Jersey.

10.     JPMorgan Chase Bank, N.A. ("Chase Bank") is a national banking association which is authorized to conduct business in the State of Michigan.

11.     Hartsko Financial Services, LLC ("Hartkso") is a limited liability company organized under the laws of the State of Delaware.

12.     Internal Revenue Service ("IRS") is an agency of the United States of America.

13.     Michigan Department of Treasury ("Michigan Treasury") is an agency of the State of Michigan.

14.     Utica Leasco, LLC ("Utica Leasco") is a limited liability company organized under the laws of the State of Michigan.

15.     Bell Fork Lift, Inc. ("Bell") is incorporated under the laws of the State of Michigan.

16.     Mary Dobday ("Dobday") is an individual who resides in the State of Michigan.

### Common Allegations

17.     Aquent is in the business of, *inter alia*, providing accounts receivable financing, more commonly known as "factoring," and other types of financing to small and medium-sized businesses.

18.     On or about January 8, 2008, Aquent, as lender, and Business Funding Associates, LLC ("BFA"), as borrower, entered into Loan and Security Agreement (the "Aquent/BFA Agreement"), attached hereto and incorporated herein as Exhibit A, wherein Aquent agreed to provide certain financial accommodations to BFA in order for BFA to provide financing to its clients. BFA, like Aquent, is in the business of providing financing to clients in the form of factoring their accounts receivable on an invoice-by-invoice basis.

19.   To secure BFA's payment and performance under the Aquent/BFA Agreement, BFA granted a security interest to Aquent in, *inter alia,* BFA's "present and future Accounts, Chattel Paper, Goods (including Inventory and Equipment), Instruments, Investment Property, Documents, and General Intangibles, and the proceeds thereof."   Aquent duly perfected its security interest in the subject collateral by filing all required financing statements with the proper authorities with respect to the collateral.

20.   Contemporaneously with the execution of the Aquent/BFA Agreement, the parties also entered into the Assignment and Assumption Agreement (the "BFA Assignment Agreement"), attached hereto and incorporated herein as Exhibit B, whereby BFA, as assignor, assigned to Aquent, as assignee, all current and future receivables due from BFA's factored clients as well as the contracts, collateral and guaranties attendant thereto.  In consideration for the advances received from BFA, MGM, one of BFA's factored clients, executed certain financing agreements, including a security agreement and the guaranties of two of MGM's principals.  Thus, pursuant to the BFA Assignment Agreement, BFA "sells, transfers, conveys and assigns to the Assignee [Aquent] the Assigned Advances and the Assigned Financing Documents," including MGM's financing documents.

21.   Given the above-described assignment and security interest, Aquent now stands in the shoes of BFA as to MGM, a factored client of BFA.

22.   MGM is engaged in the business of engineering, designing and manufacturing of checking fixtures and gages for the automotive industry.

23.   BFA established a factoring account relationship with MGM pursuant to the Factoring Agreement dated January 23, 2008 (the "Factoring Agreement"), attached hereto and incorporated herein as Exhibit C.  Among other things, the Factoring Agreement provides a

formula and procedure by which MGM could, and did, obtain funding from BFA based on MGM's generation of new accounts receivable. In the Factoring Agreement, BFA agreed, *inter alia*, to purchase certain accounts receivable of MGM and to extend a line of credit to MGM based on its receivables.

24.    In connection with the Factoring Agreement, MGM granted to BFA a security interest in all of MGM's assets, including but not limited to, MGM's accounts receivable, inventory, machinery, and equipment. *See,* Security Agreement ("MGM Security Agreement"), attached hereto and incorporated herein as Exhibit D.

25.    This security interest was duly perfected by the filing of UCC-1 financing statements with the Secretary of State for the State of Michigan. *See,* Exhibit E, attached hereto and incorporated herein. The subject collateral ("Collateral") consists of the following:

> All of Borrower's: Accounts Receivable; Inventory; Machinery and equipment, Copyrights, trademarks, licenses, intellectual property rights; Commercial tort claims; if any, whether now existing or hereafter arising; General intangibles of every kind and description not otherwise included in the foregoing; Cash and non-cash proceeds and products of any of the foregoing, including any claim against third parties (including insurance proceeds) in any way related to the foregoing; and Books, records and computers relating to the foregoing, including but not limited to hard drives, compact disks, floppy disks, and/or other digital storage media comprising such records in whole or part.

26.    MGM's indebtedness to BFA under the Factoring Agreement was guaranteed by two (2) principals of MGM, Defendants Porath and Mast. *See,* Continuing Guaranty (the "Porath/Mast Guaranty"), attached hereto and incorporated herein as Exhibit F.

27.    Pursuant to the BFA Assignment, Aquent is entitled to enforcement of the Factoring Agreement, MGM Security Agreement and the Porath/Mast Guaranty since both BFA and MGM are in default under the subject loan documents.

28.     In connection with BFA's default, the <u>Participation Agreement</u> was executed between BFA and Resource Management Partners, Inc. ("Resource"), acting as agent for Aquent, on May 1, 2008 (the "BFA/Resource Participation Agreement"), attached hereto and incorporated herein as Exhibit G.   Through this agreement, the administration of MGM's account with BFA was transferred to Resource, as agent for Aquent, and Aquent was thereby authorized to directly collect all amounts due and owing under the Factoring Agreement from MGM and its customers on factored invoices.

29.     On or about May 5, 2008, BFA notified, in writing, the customers of MGM who owed money on factored invoices to no longer remit payment for same to BFA.   This communication advised MGM's customers to remit payment instead to "Aquent, LLC." *See,* Letter from BFA, attached hereto and incorporated herein as Exhibit H.

30.     MGM also sent a similar communication to its customers on factored invoices.

31.     On or about August 1, 2008, a conference call took place in which representatives of Aquent, Resource, MGM, Hartsko, and non-party All World Generators ("All World") discussed the status of MGM's account and other relevant matters.   During that discussion, Defendant Porath, the President of MGM, acknowledged that MGM had inappropriately obtained financing on certain "bill and hold" invoices which were billed to All World.   A "bill and hold" invoice is one which is sent out prior to the product having been delivered by the manufacturer to the purchaser.

32.     MGM and Porath knew, or should have known, that funding for bill and hold invoices was not available under the Factoring Agreement.   The Factoring Agreement expressly states in pertinent part as follows:

> 6.3     We [MGM] represent and warrant with respect to each Receivable as it arises:

> 6.3.1  Seller will have made delivery of the goods or will have rendered the services ordered;
>
> 6.3.2  The Customer will accept or has accepted the goods and/or services.

*See,* Exhibit C.

33.   Further, in Paragraph 16.17 of the Factoring Agreement, MGM and Porath warranted as follows:

> The Receivables being advanced against (i) are genuine, are in all respects what they purport to be, and are not evidenced by a judgment; (ii) represent undisputed, bona fide transactions completed in accordance with the terms and provisions contained in the documents delivered to you with respect thereto; (iii) the amounts shown on our books and records and all reports, invoices and statements which may be delivered to you, in written or electronic form, with respect thereto are actually and absolutely owing to us and are not in any way contingent.

*See,* Exhibit C.

34.   The issuance by MGM of bill and hold invoices and, most particularly, MGM's inclusion of such invoices for factored funding constitute significant and material breaches of the Factoring Agreement which was, and remains, detrimental to Aquent.

35.   Subsequent to the above-referenced teleconference, Aquent and Resource arranged for an audit of MGM's inventory. As a result of this audit, Aquent reasonably suspects that MGM has presented for funding additional invoices that were not eligible for factoring by Aquent or has otherwise not been forthright in its dealings under the Factoring Agreement.

36.   Section 1.5 of the Factoring Agreement defines various events of default, including, but not limited to, the following:

> nonpayment when due of any amount payable on any of the Obligations or failure to perform or observe any agreement or meet any obligations of ours contained herein or in any other agreement out of which any of the Obligations arose or which secures any of the Obligations.

*See,* Exhibit C.

37.   Consequently, Aquent terminated the Factoring Agreement based on MGM's default thereunder.

38.   All amounts due and owing by MGM under the Factoring Agreement became immediately due upon termination of Aquent's credit facility to MGM. *See,* Paragraph 10.1.2, Exhibit C.

39.   In spite of demand therefor, MGM has failed and refused to pay its obligations to Aquent in accordance with the Factoring Agreement as of the date hereof.

40.   There is presently due and owing by MGM to Aquent the sum of at least $3,159,795.24, as of November 7, 2008, together with such additional sums as are due and owing under the Factoring Agreement from November 7, 2008 through entry of Judgment, plus interest, costs, disbursements, fees, and other expenses, including reasonable attorney's fees. *See,* Affidavit of Donald W. Barrick, attached hereto and incorporated herein as Exhibit I.

41.   Since termination of the credit facility, MGM has engaged in conduct which violates Aquent's rights under the Factoring Agreement and as a secured creditor and which appears to be intended to delay, hinder and/or defraud Aquent.

42.   On or about August 31, 2008, MGM entered into the Asset Purchase Agreement, attached hereto and incorporated herein as Exhibit J, with Defendant Sinacola for the purchase of MGM's business "as a going concern." Upon information and belief, the sale of a significant part of MGM's assets occurred on or about September 3, 2008, for a purchase price of $136,000.00 (the "Sale").

43. The transfer of MGM's assets, including "certain inventory, raw materials, components and work-in-progress," was in violation of the provisions of the Factoring Agreement and MGM's obligations thereunder and Aquent's lien in such assets.

44. Further, the purchase price for the assets was not reasonably equivalent to the value of the purchased assets.

45. The Sale left MGM with inadequate assets from which to conduct business and was either made when MGM was insolvent or it rendered MGM insolvent.

46. At the time of the Sale, MGM was apparently not able to pay its bills when they became due. MGM was in default under the Factoring Agreement, was a defendant in at least two (2) collection lawsuits, and was delinquent in the payment of employee withholding taxes, as evidenced by the filing of liens against MGM by Defendants IRS and Michigan Treasury.

47. Sinacola is an account debtor of MGM and presently owes approximately $134,000.00 pursuant to invoices which were factored by Aquent.

48. Sinacola knew, or should have known, of Aquent's security interest in MGM's assets and of Aquent's right to collect the accounts receivable of MGM, most particularly, the receivables which Sinacola owes MGM and which are payable to Aquent.

49. Sinacola knew, or should have known, that the Sale either was made when MGM was insolvent or that MGM would be rendered insolvent by the Sale.

50. Upon information and belief, Sinacola transferred the assets obtained in the Sale to Defendant MGT shortly after the Sale.

51. MGT was established as a Michigan limited liability company on or about September 4, 2008 by David Sinacola, the current President of Sinacola. According to the

records of the Secretary of State for the State of Nevada, Defendant Mast, one of the principals of MGM, was a Treasurer of Sinacola.

52.     Since the transfer from Sinacola to MGT, Aquent has learned that Defendant Dobday, an employee of MGM, has advised, by way of telephone calls and the generation of written invoices, certain account debtors of MGM to tender payment to either MGM and/or MGT, instead of to Aquent.

53.     Dobday, in her capacity as an employee of MGM, is responsible for the preparation of MGM's accounts receivable invoices for the benefit of Aquent, by including on such invoices the directive that payment be made to Aquent, as referenced in Paragraphs 29 and 30 hereinabove.

54.     The Factoring Agreement also provides that Aquent, as the assignee of BFA, has the right to obtain and inspect MGM's invoices and other related financial books and records and has the right to audit and verify the accuracy of MGM's accounts receivable information. MGM has not provided all such invoices, books and records which have been requested by Resource and/or Aquent, in violation of the Factoring Agreement.

55.     Defendants Prestige, Chase Bank, Hartsko, IRS, Michigan Treasury, Utica Leasco and Bell (collectively, the "Lienors") have recorded security interests in all or some of the assets of MGM. Aquent maintains that it has a valid and perfected security interest in the subject collateral. The Lienors also have recorded security interests as to all or some of the subject property. Plaintiff requests that the Court determine the respective validity and priority of the security interests of Aquent and the Lienors.

### COUNT I
### Breach of Contract
### [as to MGM]

56.     Plaintiff hereby re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 55 as though fully set forth herein.

57.     Under the terms of the Factoring Agreement, MGM is in default of payment.

58.     MGM has failed, refused, and neglected to cure the default in spite of demand therefor.

59.     As of November 7, 2008, MGM owes Plaintiff the sum of at least $3,159,795.24, together with such additional sums as are due and owing under the Factoring Agreement from November 7, 2008 through entry of Judgment, plus interest, costs, disbursements, fees, and other expenses, including reasonable attorney's fees. *See,* Exhibit I (Affidavit of Donald W. Barrick).

WHEREFORE, Plaintiff prays for Judgment against Michigan Gage and Manufacturing, LLC in the amount of at least $3,159,795.24, plus interest, costs, disbursements, fees, and other expenses, including reasonable attorney's fees, and that the Court grant such other legal and equitable relief as it deems just and proper.

### COUNT II
### Quantum Meruit
### [as to MGM]

60.     Plaintiff hereby re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 59 as though fully set forth herein.

61.     Under the terms of the Factoring Agreement, BFA extended credit to MGM at the request of MGM and for the benefit of MGM in connection with its business operations.

62.     MGM requested funding from BFA for the purpose of financing its business and it received at least the amount which is currently due and owing to Aquent, as the assignee of BFA.

63.     Based on the foregoing, MGM would be unjustly enriched unless it is compelled to pay back the financing proceeds to Plaintiff.

WHEREFORE, Plaintiff prays for Judgment against Michigan Gage and Manufacturing, LLC in the amount of at least $3,159,795.24, plus interest, costs, disbursements, fees, and other expenses, including reasonable attorney's fees, and that the Court grant such other legal and equitable relief as it deems just and proper.

## COUNT III
## Fraudulent Transfer
### [as to MGM, Sinacola and MGT]

64.     Plaintiff hereby re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 63 as though fully set forth herein.

65.     Aquent is secured in all of MGM's assets, including, but not limited to, its accounts receivable, inventory, machinery and equipment.

66.     Shortly after Aquent terminated MGM's credit facility under the Factoring Agreement, based on MGM's default thereunder, MGM sold a substantial portion of its assets to Sinacola, in clear violation of the terms of the Factoring Agreement.

67.     The Sale was intended to hinder, delay or defraud Aquent in its enforcement of the Factoring Agreement and its rights as a secured creditor.

68.     The purchase price for the Sale, $136,000.00, was not reasonably equivalent to the value of the assets transferred.

69.     Following the Sale, MGM's assets were insufficient for it to continue its business activities.

70.     At the time of the Sale, MGM was insolvent or it became insolvent as a result of the Sale.

71.     It appears that the Sale was not an arms-length transaction but was designed for the purpose of MGM retaining control of its manufacturing operations by transferring MGM's assets initially to Sinacola, and then to MGT.      MGT is a newly-formed company which Plaintiff maintains is the alter ego of MGM.

72.     Upon information and belief, Plaintiff has reason to believe that MGT has continued the business operations of MGM in that it utilizes substantially the same work force, has the same customer base and is completing customer orders which were originated by MGM.

73.     Dobday, who Aquent knows to be an employee of MGM, has been misdirecting MGM's account debtors to render payment to either MGM or MGT, instead of to Aquent, thus subverting Aquent's right of payment on such account receivable invoice.

74.     The close relationship between the principals (David Sinacola, President of Sinacola and the founder of MGT, and Mast, Chief Financial Officer of MGM and former officer of Sinacola), the fact that Sinacola was an account debtor of MGM in the approximate amount of $134,000.00 (an amount which was nearly the same as the purchase price), the immediate transfer from Sinacola to MGT, and the actions of Dobday demonstrate that the transaction was not made in good faith and, additionally, was intended to hinder, delay and/or defraud Aquent's rights as a creditor of MGM.

75.     Plaintiff alleges that the Sale constitutes a fraudulent transfer under Michigan's Uniform Fraudulent Transfer Act, MCL 566.31, *et seq.*, as well as under MCL 566.221.

76.     Applicable law provides for several remedies in favor of an adversely affected creditor, including, but not limited to, avoidance of the transfer to the extent necessary to satisfy the affected creditor's claims, attachment against the transferred assets, issuance of an injunction as to further disposition of assets by the debtor or transferee, and, appointment of a receiver.

WHEREFORE, Plaintiff prays for Judgment against Michigan Gage and Manufacturing, LLC, The Sinacola Group, Ltd., and Michigan Gage Technologies, LLC, jointly and severally, in the form of avoiding the Sale, attaching the transferred assets, enjoining said Defendants, and their agents, employees, successors and assigns, from further selling, transferring, disposing of or dissipating Aquent's collateral, and appointing a receiver, and that the Court grant such other and further relief as it deems just and proper, including but not limited to, the award of monetary damages and reimbursement of costs and reasonable attorney's fees in connection with this proceeding in favor of Plaintiff and against said Defendants, jointly and severally.

### COUNT IV
### Claim and Delivery
### [as to MGM, Sinacola, MGT and Lienors]

77.     Plaintiff hereby re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 76 as though fully set forth herein.

78.     Pursuant to the MGM Security Agreement and Aquent's interest therein, Aquent is lawfully entitled, among other things, to possession of MGM's inventory, machinery and equipment (the "Hard Asset Collateral"). Aquent has demanded that MGM voluntarily surrender the Hard Asset Collateral but MGM has failed to so surrender such as of the date hereof.

79.     The estimated value of the Hard Asset Collateral, for purposes of MCR 3.105(C)(2), is approximately $1,115,605.00.

80.     Each item included in the Hard Asset Collateral is an independent piece of property, as required by MCR 3.105(C)(3).

81.     Some of the Hard Asset Collateral is stored in a warehouse which is contractually under the control and custody of a third party, RWSI, Inc. ("RWSI"), pursuant to Warehousing Agreement ("Warehousing Agreement") entered into by MGM, Hartsko and RWSI.  Hartsko is also a secured creditor which has an interest, *inter alia*, in MGM's inventory and other hard assets.  Hartsko entered into the Warehousing Agreement as a means of protecting its interest in the finished products and other items which are being stored in the warehouse.  Aquent shares a security interest in the same collateral and, therefore, Hartsko and Aquent have been, and will continue to be, cooperative with regard to the warehouse operation.

82.     Nevertheless, Aquent believes that items may have been removed from the warehouse in violation of the contract by MGM, Sinacola and/or MGT, or their respective agents and employees, to the detriment of Aquent's security interests therein.  The location of any such removed collateral is unknown.

83.     Upon information and belief, certain of MGM's tooling, machinery, equipment and work-in-progress inventory were physically transferred to MGT, by virtue of the Asset Purchase Agreement between MGM and Sinacola and Sinocola's subsequent transfer to MGT.

84.     Applicable law provides that Aquent's security interest in the property so transferred is in full force and effect as of the date hereof.

85.     The remaining hard assets of MGM remain in the control and custody of MGM along with MGM's books and records.

86.     The property in which Plaintiff is secured is not in Defendants' custody by virtue of any execution or attachment against the personal property of Plaintiff, nor by virtue of any warrant for the collection of taxes, assessments or fines.

87.     Plaintiff is apprehensive that MGM, Sinacola and/or MGT will use, sell, conceal, dispose of, or impair the value of that portion of the Hard Asset Collateral which remains in their possession and control so as to substantially impair the value thereof to the detriment of Plaintiff.

88.     Lienors also may have security interests in the Hard Asset Collateral and Plaintiff requests that the priority and validity of such be determined in this proceeding.

89.     Plaintiff seeks judgment based upon the allegations set forth above in accordance with MCL 600.2920 and MCR 3.105.

WHEREFORE, Plaintiff requests that this Court enter a Judgment in favor of Plaintiff as follows:

A.      requiring Defendants to show cause why Plaintiff should not be entitled to immediate possession of the Hard Asset Collateral;

B.      requiring Defendants MGM, Sinacola and MGT to account for all items of Hard Asset Collateral in their respective possession and control;

C.      finding that Plaintiff is entitled to immediate possession of the Hard Asset Collateral and directing Defendants to deliver to Plaintiff those items of collateral which remain in their possession or to otherwise make such collateral available to Plaintiff;

D.      requiring Defendants MGM, Sinacola and MGT to pay to Plaintiff all of its costs of collection, including reasonable attorney's fees;

E.      temporarily restraining and prohibiting any Defendant who is in possession of any of the Hard Asset Collateral from damaging, destroying, concealing, diverting, disposing of, or

using any of the Hard Asset Collateral until further order of this Court, except as may be consented to by Plaintiff; and,

F.       enter Judgment of Possession in favor of Plaintiff, and permit disposition of the Hard Asset Collateral in accordance with the MGM Security Agreement and applicable law, and grant such other and further relief as the Court deems just and proper.

## COUNT V
### Request for Accounting and
### Turnover of Books and Records
### [as to MGM, Sinacola and MGT]

90.       Plaintiff hereby re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 89 as though fully set forth herein.

91.       Aquent, as the assignee of BFA, has the right to obtain and inspect MGM's invoices and other related financial books and records in connection with the Factoring Agreement.

92.       MGM has not provided all of the documents, books and records which it is required to provide to Aquent, in spite of the demand therefor.

93.       MGM may have, in violation of the Factoring Agreement and its obligations thereunder, transferred some of its documents, books and records to either Sinacola or MGT or both.

94.       Aquent is entitled to review all such documents, books and records, regardless of their current location and custodian.  Aquent is also entitled to access to the books and records of Sinacola and MGT in connection with the improper transfer of MGM's assets and the business activities generated therefrom, particularly in light of MGT being the alter ego of MGM.

95.     Plaintif is also entitled to an accounting from said Defendants in connection with the Factoring Agreement.

WHEREFORE, Plaintiff prays that the Court enter judgment against MGM, Sinacola and MGT, as applicable, whereby the requisite documents, books and records are turned over to or are otherwise produced to Plaintiff, and that said Defendants be directed to account to Aquent as to all accounts receivable generated by them and all payments received in connection thereto with regard to MGM's obligations under the Factoring Agreement, and that the Court grant such other and further relief as it deems just and proper.

**COUNT VI**
**Injunctive Relief**
**[as to all applicable Defendants]**

96.     Plaintiff hereby re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 95 as though fully set forth herein.

97.     Based on the recitation of facts herein, Aquent's security interest in the assets of MGM, including, but not limited to, the accounts receivable and hard assets, is being immediately and irreparably harmed by the conduct of MGM and other Defendants who are, upon information and belief, acting at the behest of, and in concert with, MGM.

98.     Specifically, MGM's account debtors have been and are being instructed by MGM, through its employee, Dobday, to pay entities other than Aquent.   Whether such instruction is accomplished verbally or in writing, it is tantamount to a conversion of the specific invoice in violation of Aquent's right to payment thereunder.

99.     Given such improper conduct, upon information and belief, it is unlikely that payments which are received by the entity to which payment was directed will  be turned over to Aquent, and no such payments have been tendered to Aquent as of the date hereof.

100.    Further, MGM sold a substantial portion of its assets in violation of its obligations under the Factoring Agreement.  MGM also engaged in fraudulent conduct, as described in Paragraphs 31 and 35 herein, which led to a termination of the subject credit facility.

101.    MGM is reasonably concerned that MGM is dissipating, and will continue to dissipate, its assets so as to avoid payment to Aquent and that it will continue to engage in conduct which impairs Plaintiff's security interest.

102.    Aquent is reasonably concerned that MGM, through its employees, including Dobday, its alter ego, MGT, and its other agents, is intercepting payments which Aquent is entitled to receive and it is retaining such misappropriated payments for its own benefit and use.

103.    Aquent maintains that it is likely to prevail on the merits of its claims against MGM and those Defendants who have been acting in concert with MGM in connection with the Collateral.

WHEREFORE, Aquent respectfully requests that the Court enjoin MGM, Sinacola, MGT, and Dobday from (1) issuing accounts receivable invoices or otherwise communicating with MGM's account debtors in a manner which violates the Factoring Agreement and interferes with Aquent's rights as to all such invoices ; (2) transferring or otherwise disposing of any of the Collateral that may be in their custody and control;  (3) intercepting and retaining payments on accounts receivable invoices which are rightfully payable to Aquent; and (4) not preserving and properly maintaining its books and records as relevant to this proceeding, and that the Court grant such other and further relief as it deems just and proper.

## COUNT VII
## Breach of Guaranty
### [as to Porath]

104.    Plaintiff hereby re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 103 as though fully set forth herein.

105.    Defendant Porath executed a personal guarantee of MGM's indebtedness under the Factoring Agreement. *See,* Continuing Guaranty, attached hereto and incorporated herein as Exhibit F.

106.    Porath has failed, refused and neglected to tender payment to Aquent in accordance with his personal guarantee, in spite of demand therefor.

107.    Porath is personally liable for all sums due and owing to Aquent by MGM. As of November 7, 2008, MGM owes Plaintiff the sum of at least $3,159,795.24, together with such additional sums as are due and owing under the Factoring Agreement from November 7, 2008 through entry of Judgment, plus interest, costs, disbursements, fees, and other expenses, including reasonable attorney's fees.

WHEREFORE, Plaintiff prays for Judgment against Michael Porath in the amount of at least $3,159,795.24, plus interest, costs, disbursements, fees, and other expenses, including reasonable attorney's fees, and that the Court grant such other legal and equitable relief as it deems just and proper.

## COUNT VIII
## Breach of Guaranty
### [as to Mast]

108.    Plaintiff hereby re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 107 as though fully set forth herein.

109.    Defendant Mast executed a personal guarantee of MGM's indebtedness under the Factoring Agreement. *See, * <u>Continuing Guaranty</u>, attached hereto and incorporated herein as Exhibit F.

110.    Mast has failed, refused and neglected to tender payment to Aquent in accordance with his personal guarantee, in spite of demand therefor.

111.    Mast is personally liable for all sums due and owing to Aquent by MGM. As of November 7, 2008, MGM owes Plaintiff the sum of at least $3,159,795.24, together with such additional sums as are due and owing under the Factoring Agreement from November 7, 2008 through entry of Judgment, plus interest, costs, disbursements, fees, and other expenses, including reasonable attorney's fees.

WHEREFORE, Plaintiff prays for Judgment against Richard Mast in the amount of at least $3,159,795.24, plus interest, costs, disbursements, fees, and other expenses, including reasonable attorney's fees, and that the Court grant such other legal and equitable relief as it deems just and proper.

Respectfully submitted,

ERMAN, TEICHER, MILLER,
ZUCKER & FREEDMAN, P.C.

Earle I. Erman (P24296)
Dianne S. Ruhlandt (P60483)
Attorneys for Plaintiffs
400 Galleria Officentre, Suite 444
Southfield, MI 48034
Phone: (248) 827-4100
Fax:    (248) 827-4106
druhlandt@ermanteicher.com

Dated:    11-19-08

F:\BUSINESS\aquent\complaint final.doc

21